## CHALMERS v. TURNIPSEED.

1. By order of the Circuit Court, with consent of all parties, including creditors, certain personalty was assigned to a widow as a chattel exemption, and $1,000 out of the proceeds of her husband's land,

as a homestead : *Held*, that these parties were estopped from afterwards claiming a return of this property from the estate of the widow, notwithstanding that the order of the Circuit Court transcended its jurisdiction, and that the exemption, both of personalty and homestead, was illegal.

2. The constitution and acts of assembly relating to homesteads and chattel exemptions, create no new estate, but simply exempt certain property from levy and sale, and when such property is assigned, the head of the family holds it as other property is held, except that it is exempt from enforced sale.

3. The right to homestead under the constitution depends upon two conditions: 1. There must be a head of a family; 2. There must be a dwelling-house where he resides. When these two conditions do not exist there is no right under the constitution to a homestead, and when they cease to exist the homestead ceases and becomes subject to the law of distribution, sale for debts, &c.

4. A homestead assigned to a childless widow out of her husband's realty under the act of 1872, 15 *Stat.*, 229, returns at her death to the husband's estate, but her estate is not responsible for any diminution occasioned by the legitimate use thereof, nor for loss or destruction without fault on her part. And the same principle governs a chattel exemption to this widow under the act of 1873. 15 *Stat.*, 372.

5. Under a bill for the settlement of an intestate's estate, lands of the intestate, covered by a mortgage held by one of the defendants, was sold by the sheriff under order of the court, which directed the proceeds to be paid to the clerk, subject to the further order of the court. A part of this money the sheriff embezzled: *Held*, that the amount so embezzled should not be credited on the mortgage, as the sheriff was in no sense the agent of the mortgagee.

6. A higher security taken for an antecedent indebtedness is an extinguishment of the lower, if accepted as satisfaction; and in the absence of proof to the contrary, the law will imply such satisfaction, *Gardner* v. *Hust*, 2 *Rich.*, 608, recognized and followed. The sealed note of two partners, *held* to be an extinguishment of a promissory note of the firm.

7. A judgment against the survivor (since deceased) of a partnership is not entitled to priority of payment out of the partnership assets, except so far as it had acquired a lien.

Before PRESSLEY, J., Newberry, February, 1882.

All the facts of this case are stated in the opinion. The Circuit decree, so far as it is involved in this appeal, was as follows:

This case began for settlement of the estate of Robert Stewart,

and now involves, also, settlement of the partnership affairs of Stewart & Coate, of whom the latter survived, but is now dead also. The numerous points involved will be taken up separately.

1. The widow of Robert Stewart, in the early stage of this case, claimed homestead, and Judge Moses allowed her $1,000 out of the proceeds of sale of the family residence, and $477 of the personal property. There was no appeal from that decision, and she received the amounts so allowed to her. It remained unquestioned for more than six years; until after her death, and until April 30, 1880, when the administrator, *de bonis non*, filed his petition in this case, calling on her administrator to refund it. Assuming that Judge Moses did not have jurisdiction in the matter of homestead, and that I, therefore, am not bound by his decision, which was clearly erroneous, yet I am forced to the conclusion that money paid out in the progress of a case under decree of the court, is notice to all having an interest in it, and the statute of limitations is therefore a bar to all claim for the same against the estate of Eliza Stewart.

*        *        *        *        *        *        *

3. James Y. Harris holds a note of Robert Stewart for $4,000, payable twelve months after date, "with interest from date at 12 per cent. per annum until paid." It was secured by mortgage, and the proceeds of the mortgaged land, except the widow's dower, and $1,239 wasted by the sheriff, was paid on said note. The questions now before me are, whether said note is to be further credited with the amount wasted by the sheriff, and whether the first year's interest, after it was due, bears interest at 12 per cent., or only at the legal rate. The principal is to bear interest from date, at 12 per cent.; but there is no provision in said note as to the rate to be borne by the interest, if not paid when due. The terms of the note cannot possibly be applied to the *interest*, because that would make it bear 12 per cent. from the *date* of the note. Such a construction could not have been intended when the note was made. The interest on the first year's interest should therefore be calculated at 7 per cent.

As to the money wasted by the sheriff, I have no proof that Mr. Harris could have prevented that by the utmost diligence. If the sheriff could then have been forced to pay said amount,

the motion for a rule against him should have been made at the instance of the clerk of the court, who, by order of the court, was authorized to receive said funds from the sheriff. The said mortgagee is therefore entitled to receive, out of the remainder of the estate, the balance due to him, calculating the interest as above ruled.

  *   *  ·*   *   *   *   *

5. Robert Stewart and John Coate were partners in trade, under the name of Stewart & Coate. The father of J. M. and R. H. Wright held in his life-time a promissory note of said firm. After his death, it came to his said sons, as distributees, and they divided it, each taking for his share a sealed note, signed Robert Stewart, John Coate.[1] The referee reports it as a partnership debt, and I agree with him. Whichever of the partners may have signed the name of Stewart & Coate to the original note is not material. Both acknowledged its validity as a partnership debt when they substituted their sealed notes for it, and their omitting the partnership name in said sealed notes is no proof that they thereby intended to remove it from being a partnership debt, and make it an individual joint and several debt. Said notes must therefore rank as partnership debts.

6. After the death of Robert Stewart, L. J. Jones, executor of Gilbal, entered judgment on a partnership debt in a suit against Coate, survivor of Stewart & Coate. He claims that it should rank as a judgment in this case. I adjudge that if any lien was acquired under said judgment, upon partnership property, the proceeds whereof are now in court for distribution, then, in that case, said proceeds must be first applied to the said judgment. But if no such lien was acquired, then my judgment is, that in marshalling partnership assets, the death of the partners does not bring said assets under the act concerning intestate estates, and so entitle judgments to be paid in preference to general debts. This ruling is also intended to cover sealed obligations.

---

[1] In the agreed statement it is said that each of the distributees took for his share a new note under the firm name for the original partnership note to Zacheus Wright, and that subsequently two of them took the sealed notes of Stewart & Coate "in the place of" the notes so held by them.—REPORTER.

From this decree all the other creditors of Robert Stewart, except James Y. Harris, and all the creditors of the firm of. Stewart & Coate, except Robert H. Wright, James M. Wright, John A. Bedenbaugh, and Joseph Caldwell as executor, appealed on the following grounds:

1. Because his honor erred in holding that the estate of Eliza R. Stewart was not responsible for the $1,000 assigned to her as homestead in land, but that the claim for the same made by the administrator and creditors of the estate of Robert Stewart was barred by the statute of limitations.

2. Because his honor erred in not charging the estate of Eliza R. Stewart with interest upon the said $1,000 from the date of its receipt by her.

3. Because his honor erred in holding that the estate of Eliza R. Stewart was not responsible for the personalty assigned to her herein as homestead exemption, or its value, to wit, $477; but that the claim therefor made by the administrator and creditors of the estate of Robert Stewart was barred by the statute of limitations.

4. Because his honor erred in not charging the estate of Eliza R. Stewart with interest upon the value of said personalty, to wit, $477, from the date she received it as such exemption.

5. Because his honor erred in holding that James Y. Harris, mortgage creditor, should not lose the sum of $1,239, arising from the sale of the property covered by his mortgage, and embezzled by the sheriff; but that the other creditors should lose the same.

6. Because in any event his honor erred in allowing the said mortgage creditor, James Y. Harris, interest upon $1,239 of his debt from the date that said amount, as proceeds of said sale, was paid into court.

L. J. Jones, as executor of A. Gilbal, and other creditors of Stewart & Coate, also appealed on the following grounds:

1. Because his honor erred in holding that the sealed notes signed by Robert Stewart and John Coate, held by J. A. Bedenbaugh, R. H. Wright, and J. M. Wright, are partnership debts of the firm of Stewart & Coate.

2. Because his honor erred in holding that the judgment of

L. J. Jones, as executor of A. Gilbal, against John Coate, survivor of Stewart & Coate, was not entitled to be first paid out of the copartnership assets of Stewart & Coate.

*Mr. T. S. Moorman,* for plaintiff.

The assignment of homestead was a nullity. 17 *S. C.,* 9. Especially in regard to the personalty, as there was no confirmation. 15 *Stat.,* 229; 7 *S. C.,* 146. The statute of limitations cannot protect the widow as to the homestead, for ten years had not elapsed; nor as to the chattel exemption, for she held it as administratrix. There is no estoppel against creditors. 17 *S. C.,* 9. Besides, these orders were intermediate, and may now be reviewed. *Ibid; Code,* § 11. The Harris mortgage should be credited with the amount applicable thereto lost by the sheriff. If the sheriff refused to pay the clerk, Harris could at any time have required it; but he seems to have done nothing. It was his negligence, not that of the creditors, that permitted the embezzlement, and the loss should not be thrown upon the latter. 2 *S. C.,* 14. At least he should lose the interest, which is damages for money detained; but here the estate did not detain it, but it was paid into the hands of the officer of the court under its order.

*Mr. Geo. S. Mower,* same side.

*Mr. L. J. Jones,* for Gilbal's estate and other creditors of Stewart & Coate.

The facts show that the Wright notes were taken as payment. They were so intended, and being a higher security, so operate. *Riley Eq.,* 181; *Story Part.,* § 369; 2 *McMull.,* 348; 2 *Rich.,* 608; 15 *S. C.,* 36; *Big. Estop.,* 578; 2 *Speer,* 438; 4 *Rich.,* 59; 16 *S. C.,* 198. The judgment against Coate, survivor, was a judgment against Stewart & Coate and against Coate, and should rank as such against both firm and individual assets.

*Mr. Y. J. Pope,* same side.

*Messrs. Suber & Caldwell,* contra.

The claim against Mrs. Stewart cannot be sustained, for her right to the property has been adjudicated.  If creditors acquiesced through *ignorance* of law, they cannot be relieved.  2 *Bail.*, 623; 2 *McCord Ch.*, 455.  Nor can they be relieved against *mistake* of law.  2 *East.*, 469; 1 *Stew.* (*Ala.*), 81; 10 *Pet.*, 137; 12 *Id.*, 32; 64 *Pa. St.*, 383; 51 *Me.*, 140; 7 *Hill* (*N. Y.*), 159.  In *Landsdowne* v. *Landsdowne*, 2 *Jac. & W.*, it is significant that Powell, the attorney, was made a party, suggesting that there may have been misrepresentations in that case.  See, too, 15 *Am. Rep.*, 323; 2 *DeSaus.*, 592; *Bail. Eq.*, 492.  Her estate is also protected by the statute of limitations.  She did not hold this personal property for life only.  There is no such limit in the constitution, nor in any of the statutes.  Nor did she hold it as administratrix, for she took it as her own, and the statute began then to run in her favor.  *Ang. Lim.*, § 174; *Speer Eq.*, 375; 1 *McCord Ch.*, 176; 7 *Johns. Ch.*, 90; 7 *Rich. Eq.*, 34; 4 *Id.*, 60, 92; 14 *Id.*, 176; 15 *S. C.*, 241; and consult *Bail. Eq.*, 324.  As to the homestead, she certainly is not liable for interest on the $1,000.  Nor did she hold the *corpus* for life only.  The constitution does not limit a homestead to the life-time.  Some of the statutes undertook to do so, but they did not do so effectually. 2 *S. C.*, 216.  But if so, the order gave this money to Mrs. Stewart absolutely.  And from the time that she took this money she held it adversely, and is now protected by the statute of limitations.  As to the Harris mortgage, there can be no blame attached to Harris, for the money was to be paid into court, subject to its further order, and Harris could not disregard this order.  The Wrights are creditors of the firm of Stewart & Coate.  The new sealed notes of the partners was not a payment of the partnership notes.  75 *N. Y.*, 535; 1 *Quincy*, 179; 12 *Johns.*, 409; 11 *R. I.*, 609; 11 *S. C.*, 527; 15 *Id.*, 72.  There is no law to sustain the claim asserted by Gilbal's estate.

April 14th, 1884.  The opinion of the court was delivered by

MR. CHIEF JUSTICE SIMPSON.  Robert Stewart, late of Newberry county, died intestate in August, 1869.  He left a personal estate, which proved to be insolvent, not paying his specialty

debts, most of which were contracted before the adoption of the constitution of 1868. His real estate consisted of two lots in Newberry village, one the homestead and the other known as "Stewart's corner." His widow, Mrs. E. R. Stewart, administered, and in July, 1870, commenced the action below to marshal the assets. The heirs at law, a creditor, one James Y. Harris, who held a mortgage on the lot known as Stewart's corner, and John Coate, the survivor of Stewart & Coate, were made parties, and the creditors, both of Stewart individually and of the firm of Stewart & Coate, were called in. During the progress of the action, Coate died, and his administrator, C. H. Suber, was made a party.

Mrs. Stewart claimed dower in the two lots and homestead in the home place, and in the personalty also. Dower was allowed in both the lots, and by order of the court, December 10, 1872, she was adjudged to be entitled to homestead in the home place, which was ordered to be sold, and out of the proceeds $1,000 to be paid her as a homestead, and on April 9th, 1873, commissioners were appointed to appraise and set off to her a homestead in the personalty. Accordingly, personalty to the value of $477 was appraised and assigned to her. The return of the appraisers was filed with the clerk, but it does not seem to have been confirmed. The above orders adjudging the homestead, &c., seem to have been passed by the consent of all the attorneys in the cause representing the various parties.

Harris established his mortgage as the first lien on the corner lot, to the extent of $4,000, by note dated January 7th, 1869, due at twelve months, with interest at 12 per cent. from date, the interest to be paid annually till paid; and by order of the court, March, 1871, this lot was sold by the sheriff at the price of $9,000, one-third cash, the balance in one and two years, the sheriff being directed to pay out of the cash proceeds $1,500 to the widow for her dower, and the remainder, after his costs and expenses, &c., to be applied to the Harris mortgage. This remainder amounted to $1,239.15. Before this application was made, by a second order, March 31, 1871, the court directed the application to be suspended until the next term of the court, and the sheriff was directed to turn over all proceeds of the sale to

the clerk of the court. Before the next term of the court, the sheriff embezzled these cash funds, and they were lost. The notes for the credit portion of the sale, however, were turned over to the clerk, out of the collection of which he paid the widow her dower, $1,500. The status of the Harris mortgage having been referred to a referee, it was urged before him that Harris should lose the amount embezzled by the sheriff, or at least the interest after it was paid into the hands of the sheriff. The referee reported otherwise, and upon exceptions, the Circuit judge sustained the referee, and ordered the application of the proceeds in the hands of the clerk to the mortgage. Under this order, the clerk applied the balance in his hands. There is still a balance due on this mortgage. No proceedings seem to have been taken against the sheriff or his sureties.

Certain creditors by the name of Wright, who at one time held promissory notes on the firm of Stewart & Coate, as partners and in their firm name, afterwards gave up their notes and took sealed notes for the same amount, signed by Stewart and Coate in their individual names. Upon the call for creditors, these parties appeared and presented these last notes against the assets of the firm of Stewart & Coate. The referee and the Circuit judge sustained these claims. The estate of one Gilbal, after the death of Stewart, obtained a judgment against Coate, as survivor of Stewart & Coate, in 1869, and this judgment was presented before the referee, claiming priority over all creditors of the firm because in judgment. This claim as a prior claim was overruled, except as to such property, if any, over which the judgment had lien.

In 1879, Mrs. Stewart died testate, appointing Mrs. Turnipseed her executrix. The plaintiff, Chalmers, was then appointed administrator *de bonis non* of Robert Stewart, and was substituted as plaintiff in this action. Chalmers, after thus becoming a party plaintiff, with the view to bring the question before the court as to the liability of the estate of Mrs. Stewart for the homestead received by her, filed a petition *in re*, alleging that the orders by which Mrs. Stewart obtained the homestead were nullities and void, and demanded that the estate of Mrs. Stewart should be held responsible for both the personal property and the $1,000 in place of real estate which she had received under these

orders.    Mrs. Turnipseed, executrix of Mrs. Stewart, was made a party defendant, and she pleaded orally (by agreement) *res adjudicata* and the statute of limitations.

Under this state of facts, and upon a report of the referee, the case was heard by Judge Pressley.    1. As to the homestead, Judge Pressley held that although the orders under which Mrs. Stewart obtained said homestead were manifestly erroneous, yet it having been allowed by the court, and paid out in the progress of the case, from which there was no appeal, and having remained unquestioned for more than six years, and until the death of Mrs. Stewart, that the claim was barred by the statute of limitations.    2. That the Harris mortgage should not lose the money, $1,239.15, embezzled by the sheriff; that his note should bear interest at 12 per cent., the interest on the first year's interest to be at 7 per cent.    3. That the claims of the Wrights should be established as against the firm of Stewart & Coate as partnership debts, and that the Gilbal judgment did not have priority over the other creditors of Stewart & Coate, except so far as to any lien it may have acquired over any other property of the firm subject to lien.    In other words, that the dissolution of the partnership by the death of one of the parties did not bind the assets under the act relating to intestate estates, entitling judgments to be paid in preference to general debts.    The appeal involves the correctness of Judge Pressley's ruling on all of these different points.

First, as to the accountability of the estate of Mrs. Stewart for the personalty valued at $477, assigned to her as a homestead out of personalty, and for the $1,000 paid her out of the proceeds of the home place as a homestead therein.    It is very clear that Judge Moses, in ordering the homestead, transcended his jurisdiction, both as to the personalty and the realty, and its allowance to Mrs. Stewart was illegal on several other grounds, yet these orders appear to have been passed by the consent of all parties interested in the matters then before the court, creditors and all.    They were passed under a mistake of law, perhaps, that Mrs. Stewart was entitled to a homestead, and no doubt, too, under a belief that the Circuit Court had jurisdiction in such matters.    But be that as it may, they were passed by consent,·

and they were intended and accepted by all parties, including Mrs. Stewart, as setting apart to her a homestead, such as the law allowed to parties entitled thereto. The property was turned over to her with that understanding, and was so accepted and enjoyed during her life, all parties acquiescing.

Under these circumstances, we think it is too late to change front, and for the creditors, either through themselves or by their representative, the administrator *de bonis non*, or for any other party to the proceeding, now to claim that the whole thing was a nullity and therefore void from the beginning, and on that account to require the estate of Mrs. Stewart to restore the original status. On the contrary, we must regard the proceeding as legal, so far as it applies to this case, and that it accomplished what all parties desired and intended to accomplish; that it gave Mrs. Stewart a homestead, such as the law provided for widows and children, and the parties on all sides must be estopped from taking any other position. *Hand* v. *Savannah and Charleston R. R. Co.*, 12 *S. C.*, 314.

Having reached this conclusion, the next question is, the homestead having terminated by the death of Mrs. Stewart, and there being no children, what has become of it? Does it return to the estate of Stewart and become liable to his creditors, or does it descend to his heirs free from the claims of creditors? This is a very important question, and it is one which has never been presented squarely to this court before, nor have we been able to find any authority on the subject elsewhere upon which we can rely. We must, therefore, adjudge the point as our own construction of the constitutional provision on the subject of homesteads and the acts of assembly in reference thereto may demand.

It has been held in several cases recently decided by the court that neither the constitution nor the acts on the subject of homesteads create any new estate different from that already vested in the head of the family; on the contrary, as we have held, their only effect is to exempt certain property from levy and sale without affecting or changing in any way the character of the estate therein. In other words, a certain portion of the property of the head of the family, as it already exists, so far as the estate therein is concerned, is set aside and walled in, so to speak, as a

homestead against invasion by process from any court. This is certainly the extent of the constitutional provision on the subject. See Constitution of 1868, Article II., § 32. No new estate then being created, nor any change being made in the title, interest, or tenure of the head of the family in the exempted property, it would follow that he would hold it, so far as the provision of the constitution is involved, precisely as he would any other of his property, except that this being a homestead it is exempt from enforced sale by court process or order.

But how long is this exemption to continue, supposing the acts of assembly to be as silent on the subject as is the constitution? Upon examination it will be seen that the constitution, it is true, does not in express terms fix a limit to the exemption as to time. The language is, "That the family homestead of the head of any family, &c., shall be exempt, such homestead to consist of the dwelling house, &c." Now although no duration is expressly fixed in this section, yet is it not necessarily limited to the existence of the thing exempted? The exemption depends upon certain conditions and surroundings, to wit, first there must be a head of a family, and, second, there must be a homestead, a dwelling house, a place where the head of a family resides. When these two conditions are present, the constitutional exception as to realty attaches, and as long as they exist the constitution is a perfect shield. But when these conditions, on account of which the exemption has been evolved, cease to exist, does not the exemption cease also? And is not a limit thus necessarily implied in the very nature of the surroundings or conditions which produce the exemption? The exemption is not a privilege or right which every citizen can claim, but it only extends to the heads of families, and it embraces only certain species of property, the homestead or dwelling place. Suppose that these essentials, one or both, are absent, either when the homestead is first claimed or afterwards, can the shield be then interposed? We think not, because the property attempted to be shielded does not occupy the position which the section demands. The section protects a dwelling house of the head of a family, and by the supposition which we have made, the property sought to be protected is not the dwelling house of the head of a family. It may

have been once, and when it was, then the protection could have been invoked, but it is not now, and therefore the protection cannot be claimed.

This must be so, otherwise there would be discrimination between classes of citizens as to the right of property, while there would be no difference in the relations which they sustained to said property. Why should one, after he ceases to be the head of a family, be entitled to any greater protection than one who has not become the head of a family? What reason is there for the homestead of the one to be exempt from his debts, and not that of the other? There can be none. It would seem to follow from this reasoning that when the constitutional provision is alone considered, the inhibition from enforced sale would terminate when either of the conditions constituting the property a homestead ceased; and the title or estate therein of the party not having been in any way changed or affected, it would be governed by the law of descent, devise, distribution, dower, and sale for payment of debts, as are applicable to any other of his property.

Now, what has been the effect of the acts of assembly on this subject? The constitution provides that the general assembly at their first session shall enforce the provisions of this section by suitable legislation; and in pursuance of this authority and direction, the general assembly did, at its first session, and at various sessions since, enact laws on the subject, and these acts have gone somewhat further than the terms of the constitution. For instance, there is nothing in the constitution which extends the homestead in terms to the widow and children of the former head of the family. No doubt its spirit and true intent embraced them, however. The general assembly has so interpreted the constitution, and all of the acts have made provision for the widow and children to claim. The first act, the act of 1868, continued the homestead of the head of the family to his widow and minor children, expressly declaring, however, that it was to be held and enjoyed by them until the youngest child became twenty-one years of age, and until the marriage or death of the widow, and that it should be limited to that period. Under this act, a limit being fixed, of course when the event determining that limit happened, the homestead ceased, and the property being freed from this

incumbrance, it fell back to the party to whom it originally belonged, or to the estate, and again became subject to all the laws which governed his other property.

The second act on the subject, "An act to reduce all acts and parts of acts as to homesteads into one act," was approved March 13, 1872. 15 *Stat.*, 229. This act provided in section 4 that the homestead, when assigned as therein directed, should "vest in the heads of the family in fee simple and be freed and discharged from all debts and liabilities whatever so long as he or she shall remain resident of the state, and no longer." It is difficult to say what was intended by this section, but it is not necessary to do this now, because whatever may have been its intent, it applied to the head of the family, and not to his widow and children, and therefore is not involved here. That act, after providing for the head of the family as above, in section 8 further directed that the widow and minor children of any deceased father shall be entitled to the right of the homestead, to be set apart by the Probate Court, but there is nothing said as to the limit, or as to the estate therein of these parties. It was while this act was of force that the order of the Circuit Court was passed allowing Mrs. Stewart, as widow, the homestead in the realty of her husband, and under which the $1,000 was paid her December 10, 1872.

The third act was approved February 22, 1873. This act, after providing for setting apart the homestead to the head of the family, without specifying any limit, or attempting to create or define the estate therein, as was attempted in the act of 1872, further provided, "that if the husband be dead, the widow and children, &c., should be entitled to the exemption in like manner as if the husband or parents were living, the exemption to be subject to partition among all the children of the head of the family in like manner as if no debts existed." It was while this act was of force that the homestead in the personalty was allowed under an order passed April 9, 1873. There has been a subsequent act, the act of 1880, the one now of force, but it has no application here, and need not be considered.

Section 8 of the act of 1872 is the section which applies to the widow and children under that act, as we have already observed. This section does not attempt to create a new estate,

nor in terms to perpetuate or limit the homestead. It simply declares that the widow and children of the deceased father and husband shall be entitled to the right of the homestead, and it provides for setting it off by the Probate Judge. The same principle then by which we have determined that the homestead described in the constitution would cease, after its conditions ceased, and would then fall back to the original estate, subject to the general law governing and controlling the property of the citizen, would apply here, and would hold that the $1,000 (as corpus) should belong to the estate of Robert Stewart on the death of his widow, disencumbered of the homestead, there being no children surviving. Having been set apart, however, to her as a homestead, by the consent of all parties, she had the right to enjoy it as such, and therefore the annual interest or income was hers. Nor should her estate be held responsible for any diminution in the corpus occasioned by the legitimate use thereof or any loss or destruction not the result of fault on her part.

The personal property, valued at $477.15, was set apart to her in kind under the act of 1873, and under that act was subject to partition among the children, but in this case there are no surviving children. Had there been, another difficult question would have been presented. Section 2 of this act does provide that when the homestead is set off, as the act directs, to the head of the family, it shall be forever discharged from all debts of said debtor then existing, or thereafter to be contracted. This provision is also found in the act of 1880, but it is not in the act of 1872. What effect this section will have on homesteads set off under the act now of force has not been considered here. There is nothing in this act which gave the widow any greater right than simply to enjoy the homestead, and she had this right to the fullest extent during her life, and at her death the property in kind fell back as she left it, impaired or consumed, if consumed, in its lawful use, as it might be.

Next, should the Harris mortgage be credited with the $1,239.15, lost by the sheriff? This mortgage covered the entire corner lot, and was entitled to be paid out of the proceeds of said lot, prior to any other claim except dower. But there could be no payment, either in whole or in part, until said proceeds

reached the hands of the mortgagee, either in person or by his agent. It is very certain that this mortgage was never paid to Harris himself. Was the sheriff his agent in such sense as that his receipt, under the circumstances, was the receipt of Harris? In *Sims et al., creditors of Rochelle*, v. *Campbell and Chambers*, 1 *McCord Ch.*, 53, it was held that the sheriff was the agent of the plaintiff in an execution for certain purposes, but he is also the agent of the law, and the plaintiff is no further bound by his acts than as they come within the scope of his authority. In *O'Neall* v. *Lusk*, 1 *Bail*, 220, the sheriff received a sum of money from a defendant in execution, taking his receipt, to be applied to the executions in his office. The plaintiff's execution was the oldest, and the amount received was more than sufficient to satisfy it, but the sheriff failed to apply the money, and went out of office leaving plaintiff's execution open. Upon the question whether the defendant was entitled to a credit, the court said upon the facts there could be no doubt about it; that the sheriff having plaintiff's execution in his hands, he was clearly entitled to receive the money, and having done so, the defendant was discharged, and the plaintiff should look to the sheriff and his sureties.

Now, if the sheriff in the case below had been acting under an execution of Harris, lodged by him, to make the money, then in receiving it by virtue of such execution he would have been the agent of Harris, and of Harris alone; and this act being within the pale of the authority delegated by Harris, would have been in substance the act of Harris. In such case the two cases, *supra*, would have applied. But the proceeding under which the property here was sold, was in the nature of a creditor's bill. It was sold for the benefit of all claimants, according to their respective rights. The proceeds were in the hands of the court awaiting an order of distribution. While in this condition the sum in question was lost by act of an officer of court, and before the court had determined finally as to the application. Under such a state of facts it cannot be said that the sheriff was the agent of Harris. Nor can Harris be held responsible on account of negligence, as there is no testimony in that direction.

As to the claim of the Wrights. The two latest cases on this

subject are *Adger & Co.* v. *Pringle*, 11 *S. C.*, 527, and *Johnson*
v. *Clarke*, 15 *S. C.*, 72.   In these cases the doctrine applied was
that where a creditor takes an obligation of an inferior or equal
rank with the old debt, whether it shall be regarded as payment
or renewal, is a question of fact depending upon the intention of
the parties, the burden of proof being upon the debtor.   In the
case, however, of *Gardner* v. *Hust*, 2 *Rich.*, 608, it was held,
"that in general the taking of a higher security is an extinguish-
ment of the lower, provided the higher security is accepted as
satisfaction, and if not so accepted, then it is merely additional
or cumulative security for the same debt," referring to 1 *Mason*,
505.   And in the absence of proof to the contrary, the authorities
seem to favor the notion that the law will imply the higher secu-
rity was in satisfaction of the inferior.

The difference between the two classes seems to be that the
taking of an equal or inferior security raises a question of fact,
with the burden of proof on the debtor ; while, when a higher
security is taken, in the absence of testimony to the contrary,
the law will imply a payment.   In the case below a higher secu-
rity was taken, to wit, sealed notes signed by Stewart and Coate
in their individual names, in the place of promissory notes in the
name of the firm, which last notes were given up ; and there was
an absence of all testimony as to a different intent.   Under the
case of *Gardner* v. *Hust, supra,* the law implies a payment, and
the Circuit judge having held otherwise, we think his ruling was
error.

The appeal of the administrator of Gilbal cannot be sustained.
One creditor has no priority over another in the assets of their
debtor, except in cases of intestacy, or where he has secured a
lien.   The debt of Gilbal did not occupy either of these posi-
tions as to the assets of the firm of Stewart & Coate.   Although
both of the partners were dead as individuals, and intestate, yet it
cannot be said that the copartnership was intestate.   It is by
special act that debts of an intestate are paid in a certain order ;
but this does not apply to the distribution of the assets of a dis-
solved or extinct copartnership.   The Circuit judge ruled that
the judgment of Gilbal should only have preference in such pro-
perty as it covered with a lien.   This, we think, was correct.

It is the judgment of this court that the judgment below be modified as herein, and that the case be remanded to be enforced in accordance with the principles herein announced.